## Appeal of THE SNEATH GLASS COMPANY.        Docket No. 346.

1. A corporate taxpayer, which acquires patents under a written agreement to pay for them a reasonable sum each year based upon the profits therefrom, and at the same time increases its capital stock without any reference in its records to the patents and distributes the increased stock pro rata to its shareholders, is not entitled to include in its statutory invested capital any amount representing the estimated value of the patents; nor is it entitled to deduct from gross income for the years 1917, 1918, and 1919, any amount representing depreciation on the estimated value of the patents.

2. A taxpayer, which has consistently charged to expense over a series of years the cost of the manufacture or purchase of molds and patterns having a life of from a few days to three to five years, is not entitled to amend its books of account, charge the cost of such molds and patterns to capital account, include the depreciated cost thereof in invested capital, and deduct depreciation from its gross income for the years 1917, 1918, and 1919, in respect of the cost of them.

Submitted December 15, 1924; decided March 9, 1925.

*Lawrence A. Baker* and *Thomas R. Rutter, Esqs.,* for the taxpayer.

*John D. Foley, Esq.* (Nelson T. Hartson, Solicitor of Internal Revenue) for the Commissioner.

Before GRAUPNER, LITTLETON, and SMITH.

This is an appeal from a determination by the Commissioner of a deficiency in income and profits taxes for the calendar years 1917, 1918, and 1919, in the amounts of $20,379.40, $24,232.39, and $17,024.84, respectively, aggregating $61,636.63. These alleged deficiencies are based upon an increase of net income for these years on account of the disallowance of the deduction of certain amounts for depreciation of patterns and on account of a reduction in the claimed invested capital. From the testimony and documentary evidence presented, the board makes the following

### FINDINGS OF FACT.

1. The taxpayer is an Indiana corporation, with its principal place of business at Hartford City, Ind. For some time prior to January 2, 1917, its capital stock was $200,000. The corporation was originally a family affair. A. C. Crimmel, his father, and three other individuals each owned one-fifth of the stock. Later some of these individuals died, and the stock went to their heirs, but the corporation remained in fact a close corporation. In 1917 there were

about 15 stockholders. A. C. Crimmel was vice president and treasurer and owned the largest number of shares. In 1894 the taxpayer started making different articles, until, in 1914 or 1915, it started in the manufacture of glassware for kitchen cabinets. Prior to that time practically everything in connection with such cabinets was made of wood and tin. It was found that many things kept better in glass. The taxpayer had been manufacturing many different items of kitchen-cabinet equipment out of glass for many months before it began the manufacture of glass sugar bins. The latter were still made of tin in 1916. In 1916 the taxpayer got up a pattern on a glass sugar bin which was much superior to a tin sugar bin.

2. Prior to January 22, 1917, A. C. Crimmel was the owner of four patents, to wit:

> Patent No. 1116559, dated November 10, 1914.
> Patent No. 1157679, dated October 26, 1915.
> Design No. 48060, dated November 2, 1915.
> Patent No. 1179286, dated April 11, 1916.

These patents were used by the taxpayer and products were manufactured thereunder prior to January 22, 1917.

3. On January 22, 1917, these patents were assigned to the taxpayer by an instrument in writing, under the terms of which the taxpayer covenanted and agreed that it would—

make, manufacture, market and sell all and each of said patent articles that it can procure a market therefor, and further hereby agrees that the said Sneath Glass Company, will pay to the said Alvie C. Crimmel, during the life of each of said Letters Patent, annually such reasonable sum as the board of directors of the said Sneath Glass Company may determine to be fair and equitable therefor, based upon the volume of sales of each and all of said articles made, manufactured and sold by it, taking into consideration the cost of production, manufacturing and marketing same, and the profit to said company therefrom; and it is further understood and agreed that should the said Sneath Glass Company sell or assign the right to make or manufacture any or all of said articles to any other persons, firms or corporations, or transfer, sell or dispose of said Letters Patent, then and in that event the said Sneath Glass Company, hereby agrees to pay to the said Alvie C. Crimmel, such reasonable sums, as may be determined upon by the Board of Directors of the Sneath Glass Company, based upon the amount received by it therefor.

4. At a meeting of the stockholders of the corporation on January 22, 1917, the following resolution was adopted:

Be it resolved by the stockholders of The Sneath Glass Company, duly organized under and [by] virtue of the laws of the State of Indiana, in regular annual meeting assembled:

That the capital stock of the said The Sneath Glass Company be increased in the sum of two hundred thousand ($200,000) dollars; that is from the sum of two hundred thousand ($200,000) dollars (its present capital stock) to the sum of four hundred thousand ($400,000) dollars.

That all of said increase of capital stock be issued and disposed of as common stock, and divided into shares of the same amount and par value, as the value of the shares provided for by the original Articles of Incorporation.

That upon the passage and adoption of this resolution that a verified certified copy of the record and proceeding of this meeting, so far as the same pertains to the increase of the capital stock of said company shall be prepared and certified to by the president and secretary of The Sneath Glass Company, which said certificate shall contain and show the total amount of the capital stock of The Sneath Glass Company, issued and outstanding as of this date, together with the amount of capital stock voted in favor of this resolution, and the increase of the capital stock as in this resolution provided.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

The president then declared that the total shares of capital stock of The Sneath Glass Company, issued and outstanding on this date being 2,000 shares, and that 2,000 shares having been duly and regularly voted in favor of the foregoing resolution and of increasing the capital stock of said company from $200,000 to $400,000, that said resolution was duly and regularly passed and adopted and said capital stock increased from said sum of $200,000 to the sum of $400,000, to be divided into shares of the same   par value each, as the shares of stock provided for by the original articles of incorporation.

It was then regularly moved by A. C. Crimmel and seconded by R. D. Sneath that the shares of stock, representing the $200,000 of increase of capital stock of the Sneath Glass Company be issued and delivered to the stockholders of said company, who were stockholders of record on the 22d day of January, 1917, such portion to be issued to each stockholder, as the number of shares held by such stockholder bears to the total number of shares of the capital stock, issued and outstanding on said day.   Which said motion was duly and regularly adopted and carried.

5. Approximately, in terms of gross sales, the manufacture of the patent appliances amounted to one-half of the total business of the taxpayer for the years 1917, 1918, and 1919.

6. The books of account of the taxpayer were kept in a very crude manner.   While the taxpayer was a corporation in name, it in reality was run as a partnership or as a family concern; it never really had an audit; no one was put under bond; and there was never any question as to how it was or should be operated.

7. The net income of the taxpayer for the years 1911 to 1913, and from 1915 to 1919, was as follows:

| | |
|---|---:|
| 1911 | $21,038.22 |
| 1912 | 32,137.00 |
| 1913 | 49,347.54 |
| 1915 | 57,993.35 |
| 1916 | 111,751.09 |
| 1917 | 97,321.17 |
| 1918 | 99,068.21 |
| 1919 | 77,460.64 |

8. The Commissioner, in determining the value of 96 shares of stock of The Sneath Glass Co. held by the father of A. C. Crimmel, deceased, October 10, 1917, fixed the value at $100 per share, total $9,600.   The taxpayer made a capital stock tax return for the fiscal year ended June 30, 1918, and placed a value of $400,000 upon the taxpayer's capital stock.

9. The Commissioner allowed no deduction for depreciation of the value of patents in the taxpayer's returns for the years 1917, 1918, and 1919.

10. Between May 6, 1911, and December 31, 1917, the taxpayer expended $18,032.76 for the manufacture or purchase of molds and patterns.   No part of this amount was charged to capital account. In the computation of invested capital for the years 1917, 1918, and 1919, the Commissioner allowed nothing for the cost of such molds and patterns.   Some of the molds and patterns would last one day and some three, four, or five years.

11. The Commissioner addressed to the taxpayer a letter of deficiency, dated August 9, 1924, which disclosed a total deficiency in tax for the years 1917, 1918, and 1919 of $61,636.63.   Approximately $9,000 of that deficiency is admitted by the taxpayer to be owing.

The determination of the Commissioner is approved.

SMITH: This appeal is from deficiencies in income and profits taxes for the years 1917, 1918, and 1919, and presents for determination the questions: (1) Whether the taxpayer is entitled to include in invested capital the depreciated cost of patents assigned to it on January 22, 1917; (2) whether it is entitled to deduct from gross income for each of the taxable years mentioned any amount representing depreciation on such patents; (3) whether it is entitled to include in invested capital the depreciated cost of molds and patterns, the cost of which was charged to expense when acquired; and (4) whether it is entitled to deduct from gross income depreciation in respect of such cost.

The pertinent facts with respect to the acquisition of patents are set forth in the findings of fact. The taxpayer was and is engaged in the manufacture of various articles of glassware. In 1914 or 1915 it started in the manufacture of glassware for kitchen cabinets. In the development of this line of manufacture, A. C. Crimmel, who was the principal stockholder, general manager, and a director of the taxpayer, took out certain patents on a glass sugar bin, distributing cap, and bracket. In 1916 or the early part of 1917 "it was talked over among the directors that the Sneath Glass Co. should own these patents, because if anything would happen I would leave the company, take my patents along, and it (the business) would go to somebody else. When the last patents were issued (April 22, 1916), I decided to give the patents to the Sneath Glass Co." (Testimony of A. C. Crimmel.)

The patents were assigned to the taxpayer on January 22, 1917, under an agreement, the next to the last paragraph of which is quoted in the findings of fact.

At a meeting of the stockholders of the corporation on January 22, 1917, an increase in the capital stock from $200,000 to $400,000 was voted, and it was provided that the shares of stock representing the $200,000 increase should be issued and delivered to the stockholders, the number of shares to be issued to each being equal to the number of shares then held by such stockholder. No notation was made in the books of the corporation or in the minutes of the stockholders' meetings which would indicate in any way that the additional shares of stock were issued by reason of the acquisition of patents.

In the light of the facts stated above, the Commissioner holds that the evidence does not warrant a conclusion that the patents were paid in to the corporation for shares of stock. It is his contention that the patents were assigned to the corporation under an agreement by which the corporation obligated itself to pay to Crimmel a reasonable amount for the use thereof.

On behalf of the taxpayer, it is contended that the patents had great value and that they were in reality paid in to the corporation

for shares of stock authorized to be issued on January 22, 1917, or that the patents were paid in to the surplus account, thereby creating a surplus of $200,000, which should be added to invested capital.

In our opinion the evidence does not show that the patents were paid in to the Sneath Glass Co., at January 22, 1917, for shares of stock in that company. Not only is there no book record which would indicate that fact, but the contract which was entered into between the taxpayer and Crimmel argues against such a contention. Apparently the directors of the company desired that the company should own the patents, and Crimmel, who was the principal stockholder and who controlled the policies of the corporation, was willing to assign them to it upon condition that it would agree to pay him such an amount for the use of the patents as the board of directors of the corporation should determine was fair and equitable.

It is argued on behalf of the taxpayer that this contract was without force or effect, so far as Crimmel was concerned, and that the promise of compensation to him was only illusory. We do not think that this view is tenable. Crimmel practically controlled the affairs of the corporation. The agreement was a sufficient consideration for the assignment of the patents. The fact that the taxpayer paid nothing under the agreement or that Crimmel waived his claim to receive compensation does not alter the essential character of the agreement.

The alternative proposition of the taxpayer is that if the patents were not paid in to the corporation for shares of its capital stock they were, nevertheless, paid in; that they had great value; and that the corporation is entitled to a paid-in surplus in respect to such value. The evidence with respect to the value of the patents is the value of the shares of stock of the corporation after the issuance of the $200,000 capital stock on January 22, 1917. The taxpayer submits that the fact that the taxpayer filed a Federal capital stock tax return in July, 1917, showing that the fair value of the 4,000 shares then outstanding was $400,000, and the further fact that the estate-tax division of the Bureau of Internal Revenue found that the value of 96 shares of the capital stock in October, 1917, was $9,600, are proof that the value after January 22, 1917, was $100 per share. It also submits that the fact that the Commissioner found that the invested capital of the corporation for 1917 was only $185,455.60 is proof that the value of the assets of the corporation at December 31, 1916, was not in excess of $200,000. It is therefore argued that the value of the assets was increased to the extent of $200,000 by the assignment at January 22, 1917, of the patents above referred to.

We are of the opinion that the evidence does not establish the fact that the patents assigned to the corporation under the agreement of January 22, 1917, had a value to the corporation of $200,000. The fact that the Commissioner found that the taxpayer was entitled to an invested capital for 1917 of $185,455.60 is not conclusive as to the value of the capital stock of the corporation at January 1, 1917. From the findings of fact, it will be noted that the year 1916 was the most prosperous year that the corporation ever had (at least to 1920), the net income for the year being $111,751.09, or practically twice as much as it had been in 1913 or in 1915. The testimony of Crimmel was to the effect that the sugar bin was still manufactured out of tin

in 1916. Therefore it must be assumed that the profits of the year 1916 were not in large part attributable to the manufacture of glass sugar bins.

Whatever may have been the facts with respect to the value of the patents if they had been assigned outright to the taxpayer, we do not think that the evidence establishes that they had a value to the corporation under the agreement of January 22, 1917. The profits of the years 1917, 1918, and 1919 were apparently due in part to the fact that the taxpayer was never required to pay anything for the use of the patents during those years. This fact could not have been foreseen by the taxpayer at January 22, 1917.

The second contention of the taxpayer is that it should be entitled to deduct from gross income for the years 1918 and 1919 a reasonable amount representing depreciation of the cost to the taxpayer of the patents in question. We are of the opinion, however, that the evidence does not establish that they cost the taxpayer anything and, accordingly, that it has not established its claim to a deduction for depreciation in respect of them.

The taxpayer contends that prior to 1917 it had expended $18,032.76 for the manufacture or purchase of molds and patterns, and that no part of this amount was included by the Commissioner in invested capital for the years 1917, 1918, and 1919. The evidence shows that some of these molds and patterns last from a day or two to five years; that the corporation has always charged to expense the cost of the manufacture or purchase of them; and that no capital account has ever been maintained in respect of them.

We are of the opinion that it was entirely proper for the taxpayer to charge these items as expenses when the molds and patterns were acquired. Conservative accounting would warrant such action. The Commissioner has never raised any question as to the correctness of such treatment. We are therefore of the opinion that the taxpayer is not entitled to include in invested capital any amount representing the estimated cost of the molds and patterns acquired in past years, and that it is not entitled to any deduction from gross income for the years 1917, 1918, and 1919, in respect of depreciation upon the estimated cost of them.

On consideration by the Board, STERNHAGEN dissents.